UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Plaintiff,       **MEMORANDUM & ORDER**

   -against-                                03 Civ. 0770 (DRH) (ETB)

SAMUEL AARON MELTZER,

                              Defendant.
-------------------------------------------------------------X
**Appearances:**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Mark K. Schonfeld, Regional Director
Northeast Regional Office, 233 Broadway
New York, New York 10279
By: Valerie A. Szczepanik, Esq.

**MEYERS & HEIM LLP**
Attorneys for Defendant
645 Madison Avenue, 20th Floor
New York, New York 10022
By: Robert Heim, Esq.

**HURLEY, District Judge**

*INTRODUCTION*

      The United States Securities and Exchange Commission ("SEC") filed the present

securities fraud claim against Samuel Aaron Meltzer ("Defendant" or "Meltzer"), alleging that he

sent "spam" e-mails that "touted" or "recommended" certain stocks on the basis of false or

misleading information in violation of Section 17(a) of the Securities Act ("Securities Act"), 15

U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Both sides

have moved for summary judgment.  Because issues of material fact remain undetermined, the

Court DENIES both motions.

*BACKGROUND*

The following recitation of the facts is undisputed unless otherwise indicated and has

been culled from the SEC's Rule 56.1 Statement and Meltzer's response thereto.

Meltzer, a Minnesota resident, was the sole owner and operator of two private

corporations that engaged in web design, web hosting, and "unsolicited bulk email advertising

services," *i.e.*, "spamming."  From 1998 or earlier until February 2001 or later, Meltzer was hired

by stock promoters to send bulk e-mails (typically five million e-mails, but sometimes 10-20

million) speaking in highly favorable terms about at least twelve publicly traded companies,

which shall be referred to as the "subject issuers".  Most of these subject issuers were publicly

traded in the over-the-counter ("OTC") market, were quoted on the OTC bulletin board, and were

"penny stocks" within the meaning of Section 3(a)(51) of the Securities Exchange Act of 1934

and Rule 3a51-1 promulgated thereunder.

In conjunction with the e-mails, Meltzer established multiple websites, each with a distinct

domain name, internet address, and business name, such as "GrowthStocks2000," "Wisestocks

2000," or "Stock-Vest."  According to the complaint, the use of multiple distinct internet

identities allowed Meltzer to "flood the Internet with promotional materials" while "avoid[ing]

detection by web hosts who seek to prevent Internet spam." (Compl. ¶ 12.)

Below is the content (including grammatical and typographical errors) of the first bulk e-

mail sent by Meltzer, though attributed to Stock-Vest:

SPECTACULAR RECOVERY IN ENERGY MARKET IN 1999. CITYVIEW SECURES SUBSTANTIAL OIL AND GAS RIGHTS COVERING AN AREA ALMOST TWICE THE SIZE OF THE STATE OF RHODE ISLAND.

## THE COMPANY

We have come across a company we feel is establishing a stronghold in an area that has historically been extremely profitable, and even more so, in developing countries where good bargains are available. This Company has its eyes and ears open. The Company has strategically positioned itself alongside some of the largest players in the oil industry. Its exclusive concession rights border oilfields run by the World's Major oil Companies. After speaking to management, we believe that down the road it could be a potential takeover target. Also, according to Company management, a future acquisition is possible. We believe all of this may cause the Company's undervalued stock price to recognize its true asset value. Based on its proven oil and gas reserves the share price should be valued at over ten times its Current share price. It is approximately one-tenth its potential value.

I'm sure you will agree that the Oil and Gas Industry is one of the most profitable arenas to be involved in these days. Return on Capital is at a high with excessively generous cash flows. This is all derived from the production of hydrocarbons into usable products in our society including: motor oil, gasoline, kerosene, airplane fuel, cigarette lighters, barbecues, cosmetics, plastics, and on and on. . . This production will keep a company liquid and strong. It also gives the company flexibility, resourcefulness, and product development in an ever-changing world, which is most appealing of all.

CityView Energy Corporation Ltd., symbol CVCL, on the NASDAQ Small Cap, as well as, the Australian Stock Exchange, symbol CVI, is an aggressive oil and gas development and production company. It was incorporated in 1987 and has been in the energy resource industry for the past several years. The Oil and Gas Industry is an exciting, dynamic industry in which companies are transforming the worldwide production of oil and natural gas into more efficient uses.

CityView Energy Corporation Ltd., is an innovator in the booming oil and gas business. Its combination of experienced entrepreneurial-minded management with highly skilled natural resources development personnel take care of the essentials for success in this rapidly growing industry. Add on strong financial backing and the latest technology for finding oil and natural gas reserves and oil drilling methodologies, you spell PROFIT, PROFIT, PROFIT! The company has achieved a stake of the dwindling worldwide oil and gas reserves (as well as aiming for new stakes), thereby maintaining an assurance of future profits.

LARGE OIL AND GAS RESERVES

When it comes to profitability in both real estate and the oil industry, the key is LOCATION, LOCATION, LOCATION!  CityView has that location, with proven reserves in one of the richest hydrocarbon areas in the world.  We believe that with oil reserves dwindling worldwide, CityView is a prime take-over candidate from major oil companies sometime down the road as it owns the oil and natural gas concession rights to a land mass almost twice the size of the State of Rhode Island, USA.

There are proven reserves, which at an in-situ price of $2 per barrel of oil and $0.27 per MFC of natural gas, would value Citiview's Hydrocarbon Reserves at $54,400,000 in Assets!

THE FUTURE IS HERE

The Company is planning to surge forward into the year 2000 utilizing the most technologically advanced, the most current and the most cost-efficient equipment, resources and processing known to the industry and to add to its reserves.  The company has access to industry leading experts in the areas of — development, communications, applications, security, finance, banking, engineering, accounting, seismology, plate tectonic mathematics and natural oil and gas refinement.  Additionally CityView's subsidiary Citra Management Pte Ltd. has recently obtained the rights to have their company trade oil and natural gas products and bi-products..  The company expects to achieve a high percentage stake of the dwindling worldwide reserves so that future profits will be assured for generations to come.  Virtually all worldwide oil and natural gas reserves will come to a halt one day; the company is developing new methodologies and energy-generating techniques to both improve efficiency on a current basis and to possibly utilize other energy sources in the future (i.e. solar).

Once again, please visit [internet address] for full details.

Disclaimer
----------
This material is being provided by Stock-Vest, an electronic newsletter paid by the issuer for publishing the information contained in this report.  Vestcom Holdings, Inc. has paid a consideration of 15,000 free trading shares of common stock of CityView Energy Corporation Limited to Stock-Vest as payment for the publication of the information contained in this report.  Stock-Vest and its affiliates have agreed not to sell the common stock received as payment for its services until January 6, 2000, which date is 15 days from the initial dissemination of this report.  After such date, Stock-Vest may sell such shares.

Because Stock-Vest is paid for its services, there is an inherent conflict of interest in Stock-Vest's statements and opinions and such statements and opinions cannot be considered independent. The information contained in this publication is for informational purposes only, and not to be construed as an offer to sell or solicitation of an offer to buy any security. Stock-Vest makes no representation or warrant relating to the validity of the facts presented nor does Stock-Vest represent or warrant that all material facts necessary to make an investment decision are presented above. All statements of opinions are those of Stock-Vest. Stock-Vest relies exclusively on information gathered from public filings on featured companies, as well as, in certain circumstances, interviews conducted by Stock-Vest management of featured companies. Investors should not rely solely on the information contained in this publication. Rather, investors should use the information contained in this publication as a starting point for conducting additional research on the featured companies in order to allow the investors to form his or her own opinion regarding the featured companies. Factual statements contained in this publication are made as of the date stated and they are subject to change without notice. Stock-Vest is not a registered investment advisor, broker or a dealer. Investment in the companies reviewed is speculative and extremely high-risk and may result in the loss of some or all of any investment made in CityView Energy Corporation Limited. This publication contains forward-looking statements that are subject to risk and uncertainties that could cause results to differ materially from those set forth in the forward-looking statements. These forward looking statements represent the judgment of CityView Energy Corporation Limited as of the date of this publication. The Company disclaims any intent or obligation to update these forward-looking statements.

(Decl. of Valerie Ann Szczepanik, dated July 28, 2004, Ex. 7 at 1-6.)

Some later e-mails distributed by Meltzer under various other names were lengthier and included more specifics about the subject issuer's structure, location, business plans and strategies, officers, financial information, etc. Although some of the subject issuers discussed in later e-mails were in different industries (including "global thermoplastics," internet gambling, breast cancer detection, artificial flowers and house plants, clothing, prepackaged school cafeteria food, and online banking), all of the e-mails invariably spoke in similarly glowing terms about the subject issuers' situations and prospects. Many contained company press releases. Nearly all contained "disclaimers" similar to the one above, but in many of the later e-mails sent by Meltzer

the disclaimer appeared in the margins, written in smaller typeface.  Some of the e-mails' subject

lines began with the label "ADV," indicating that it was an advertisement, rather than an

independent report.

Meltzer did not enter into any contracts with the subject issuers discussed in his e-mails

and websites, and the information contained in his e-mails and websites came largely from

promotional materials provided by two stock promoters, Steven M. Cohen and Howard I.

Weinstein ("Cohen and Weinstein").  In fact, Meltzer testified at deposition that he "never

changed anything on [his] own."  (Dep. of Samuel Aaron Meltzer, dated March 25, 2004

("Meltzer Dep.") at 22.)  From time to time, he would indicate that he had a problem with the

content, saying, "If they came out with something saying, you know, this was a strong buy or if

the stock would soon be at this price or target price or anything of that nature, I would say, 'You

can't – I will not put that in there . . . . [b]ecause my lawyer told me I should not . . . ." (*Id.*)

These suggestions, however, were not based upon any expertise, as Meltzer had none.  (*See id.* at

87 (Q: "[D]o you have any background in finance or accounting?" Meltzer: "No.").)   Meltzer

also added press releases to the e-mails and websites, which he had culled from Yahoo.com and

FreeEDGAR.com.  Ultimately, the e-mails and websites involved no original information from

Meltzer; his contribution was collecting and formatting, but involved no actual knowledge of

securities.  (*See id.* at 40 ("I would take the information number by number.  I would not change

anything.").)

Turning to the disclaimers, which were created by Meltzer, they misrepresent a number of

facts.  For example, the above-quoted disclaimer states that "[a]ll statements of opinions are

those of Stock-Vest," when, as Meltzer now insists, the statements of opinions were entirely

those of Cohen and Weinstein. (*See id.* at 65 (Q: "[W]hose opinions are represented in the e-mail?" Meltzer: "Howard Weinstein and Steve Cohen's, because they had sent me the material . . . .").) Meltzer's disclaimer also indicated that he "relie[d] exclusively on information gathered from public filings on featured companies, as well as, in certain circumstances, interviews [with] management." This too was misleading: Meltzer may have attached or linked the press releases or public filings of the companies he discussed, and he may have spoken with management on a limited number of occasions (*see id.* at 49-50 (Q: "So was [your conversations with management concerned] more the format of the web site as opposed to the content?" Meltzer: "Yes.")), but the opinions expressed in the e-mails were written entirely by Cohen and Weinstein, and not Meltzer nor the invented corporation Stock-Vest (*see id.* at 73 (Q: "[B]ut what you're telling me today is that the opinion was actually those of your client." Meltzer: "Yes.")). It was not established whether Cohen and Weinstein had conducted interviews with "management."

Cohen and Weinstein compensated Meltzer primarily by transferring thousands of shares of stock in the subject issuers into Meltzer's personal brokerage accounts. Meltzer admits that he understood that Cohen and Weinstein, for their promotional services, were paid considerably more shares of the subject issuers' stock than he was paid, but deliberately removed this information from those materials before publishing and disseminating them in his websites and spam emails. Thus, the amounts of shares listed in the disclaimer reflected the amount received by Meltzer, rather than the number of shares received by Cohen and Weinstein, who were the actual composers of the substantive portions of the e-mails and websites.

The SEC alleges that Meltzer "received at least $159,619.62 in stock and cash as ill-gotten gains as a result of his fraudulent conduct" described above. (Compl. ¶ 13.) Meltzer

admits that subsequent to the above activities, he has continued to provide bulk email, web hosting and web designing services to clients, achieving gross profits of $175,000 per year in 2002 and 2003. (*See* Meltzer Dep. at 92.) In July 2002, the Attorney General of Washington, Consumer Protection Division, sued Meltzer for alleged violations of Washington's Unfair Business Practices — Consumer Protection Act and Unsolicited Electronic Mail Act. Meltzer's settlement of the case bars him (within Washington) from using false or misleading information in the subject line of an e-mail, or misrepresenting the identity of the sender or origin of a commercial e-mail.

The SEC filed the present suit on February 18, 2003. The complaint alleges that Meltzer violated, and "may again violate" Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The complaint seeks a permanent injunction barring Meltzer from further violations of the above provisions, an order requiring Meltzer to account for and disgorge all monies obtained through the activities described, an order requiring Meltzer to pay civil penalties, and an order permanently prohibiting Meltzer from participating in any offering of penny stock. Both parties filed their present summary judgment motions on October 12, 2004.

## DISCUSSION

I. *Summary Judgment: Legal Standards*

Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R.

Civ. P. 56(c)). A district court considering a summary judgment motion only determines whether

triable factual issues exist; it does not resolve those issues. *See Eastman Mach. Co., Inc. v. U.S.*,

841 F.2d 469, 473 (2d Cir. 1988) (internal citations omitted). No genuinely triable issue exists

when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and

after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no

rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92

F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)). To defeat a summary judgment motion

properly supported by affidavits, depositions, or other documentation, the non-movant must offer

similar materials setting forth specific facts that show that there *is* a genuine issue of material fact

to be tried. The opponent cannot rely on the allegations in his or her pleadings, conclusory

statements, or "mere assertions that affidavits supporting the motion are not credible." *Gottlieb

v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion thus must also be "mindful of

the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928

(5th Cir. 1997) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)), because the

evidentiary burdens that the respective parties will bear at trial guide district courts in their

determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211

(2d Cir. 1988). Where the non-moving party would bear the ultimate burden of proof on an issue

at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to

support an essential element of the non-movant's claim. *Id.* at 210-11. By contrast, where

plaintiff moving for summary judgment bears a much greater initial burden; it must show that the

evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant. *See Select Creations, Inc. v. Paliafito America, Inc.*, 911 F. Supp. 1130, 1149 (E.D. Wis. 1995).

The fact that both sides have moved for summary judgment does not guarantee the absence of triable material issues of fact. *Id.* Rather, where both plaintiff and defendant move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981). When considering cross-motions for summary judgment, a court "need not enter a judgment for either party, but must examine each motion separately and, in each case, draw all reasonable inferences against the moving party." *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 274 (E.D.N.Y. 2002) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001), and *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

"Summary judgment is likely to be inappropriate," but is certainly not unobtainable, where the material issues concern intent, or are otherwise 'complex and convoluted.' " *Sec. and Exch. Comm'n v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). This is so even where the SEC is both the plaintiff and the moving party. *See id.*

II. *The Securities Act, the Exchange Act, and Relevant Legal Principles*

As discussed, the SEC alleges that Meltzer's actions violated the Securities Act and the Exchange Act. Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), states in relevant part:

> It shall be unlawful for any person in the offer or sale of any
> securities . . . by the use of any means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j states in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

And, finally Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act, states in full:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

In order to establish liability under the Exchange Act and Rule 10b-5, a plaintiff must prove "that [1] in connection with the purchase or sale of a security the defendant, [2] acting with scienter, [3] made a material misrepresentation (or a material omission if the defendant had a

duty to speak) or used a fraudulent device." *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). The Securities Act applies "essentially the same elements," except that scienter need not be established to obtain an injunction under Section 17(a)(2) or (3). *First Jersey Secs.,* 101 F.3d at 1467 (citing *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980)). Despite the fact that Meltzer claims that he was merely an internet technician, "liability rests with any person who meets the required elements, regardless of his role in the activity (*i.e.* lawyer, accountant, banker, etc.)." *Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1224 (10th Cir. 1996).

The parties do not dispute that Meltzer's actions occurred "in connection with the purchase or sale of securities," nor do they dispute that the e-mails and websites, particularly the disclaimers, contain misrepresentations. Thus, the only disputed issues are whether Meltzer acted with the requisite "scienter," pursuant to the Exchange Act and Rule 10b-5, and whether his alleged misrepresentations or omissions were "material."

III.    *Scienter*

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *First Jersey Secs.*, 101 F.3d at 1467. Some aspect of the projection must be actually false, and known to be false to the defendant making the promise at the time it was made, for the projection to be fraudulent. *See In re Integrated Resources Real Estate Ltd. Partnerships Securities Litigation*, 850 F. Supp. 1105, 1141 (S.D.N.Y. 1993).

Additionally, if the conduct was highly reckless, it may rise to the level of scienter without an actual showing. Under such circumstances, the decision must have been "highly unreasonable," representing "an extreme departure from the standards of ordinary care . . .  to the

extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978); *see also Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000); *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). Furthermore, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (citations and quotation marks omitted).

Meltzer's scienter is virtually indisputable. He admitted that the disclaimers were in his sole control, adding that in the instances where Cohen and Weinstein provided their own disclaimer, he removed theirs and inserted his own. (*See, e.g.,* Meltzer Dep. at 33 (Meltzer: "When it had their disclaimer, I put my own disclaimer on it." Q: "And you removed their disclaimer?" Meltzer: "Yes.").) He admitted that despite the fact that the disclaimers attributed the composition of the substantive content of the e-mails and websites to various nonexistent entities rather than to the actual composers, *i.e.*, Cohen and Weinstein. (*See, e.g.*, *id.* at 73 (Q: "And you knew their name, but you wouldn't put their name there?" Meltzer: "No." Q: "And that was a choice you made?" Meltzer: "Yes." Q: "Even though you knew it was their opinion and not yours?" Meltzer: "Yes.").) He admitted that he invented the nonexistent entities as the authors with the intention that recipients of the e-mails would not know who the actual authors were. (*See* Meltzer Dep. at 72 (Meltzer: "[S]ince bulk e-mail is so hated . . . I didn't want their name to – I didn't want them to be affiliated with the bulk mail . . . .").) Thus, it is abundantly clear that Meltzer intended to deceive the recipients of these e-mails and visitors to the website regarding the origin of information that they were reading regarding the subject issuers.

Meltzer raises one, potentially viable defense.  He asserts that he "relied on the advice of counsel in appending that disclosure language, which was drafted by counsel, to the distributions." (*Id.* at 21.)  In support of his position, Meltzer quotes the following proposition: "Good faith reliance on the advice of an accountant or an attorney has been recognized as a viable defense to scienter in securities fraud cases," *S.E.C. v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (citations omitted). In such cases, "good faith reliance" is "not a complete defense, but only one factor for consideration." *Markowski v. S.E.C.*, 34 F.3d 99, 105 (2d Cir. 1994). "To establish the defense, the defendant should show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith." *Id.*

In the present case, Meltzer did seek the advice of counsel, but there is nothing in the record to demonstrate that he made a complete disclosure, nor is there any indication that counsel advised Meltzer that the conduct was appropriate.  (*See* Meltzer Dep. at 110-115 (indicating that Meltzer did not discuss the actual content of the e-mails or websites with counsel).)  In fact, Meltzer's testimony demonstrates that he did not make a full disclosure.  (*See id.* at 112 (Q: "Did [your attorney] review each profile you sent out?" Meltzer: "No, he did not.").)

Finally, Meltzer cannot reasonably argue that he relied upon the advice of his attorney in good faith when Meltzer knew that the disclaimers were misleading.  The mere fact that his attorney willingly approved the disclaimers cannot establish a defense of good faith reliance when the knowing misrepresentations clearly establish bad faith. *Cf. S.E.C. v. DCI Telecomm.*, *Inc.*, 122 F. Supp. 2d 495, 500n.2 (S.D.N.Y. 2000) (citing *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979) ("If a company officer knows that the financial statements are false or

misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.")).  Accordingly, no reasonable fact finder could conclude that Meltzer did not act with scienter.

*IV.*     *Materiality*

Because Meltzer acted with scienter, the only remaining question is whether the misrepresentations were material. A factual statement, misrepresentation, or omission is material if there is a substantial likelihood that the misrepresentation "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Phrased differently, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* at 241. Nevertheless, to be material, a fact need not be outcome-determinative — that is, it need not be important enough that it would necessarily cause a reasonable investor to change his investment decision. *See Folger Adam Co. v. PMI Industries, Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991). There is no need to show that investor reasonably did rely on misstatements; a showing that a reasonable investor likely *would* rely on the misstatements is sufficient. *See S.E.C. v. Berger*, 322 F.3d 187 (2d Cir. 2003).

Materiality is a  "fact-specific inquiry,"  *Basic*, 485 U.S. at 241, and a "relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it." *In re Donald J. Trump Casino Sec. Litig. — Taj Mahal Litig.*, 7 F.3d 357, 364 (3d Cir. 1993) (citing *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 763

(2d Cir. 1991)).  As a result, "[t]he determination of materiality is a mixed question of law and fact that generally should be presented to a jury." *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citations omitted).  "Only if no reasonable juror could determine that the undisclosed delay in receipt of proceeds at maturity would have assumed actual significance in the deliberations of the reasonable investor should materiality be determined as a matter of law." *Id.* at 538.  Following *Basic*, the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  Finally, the burden of proof regarding materiality rests squarely on the shoulders of the  SEC.  *See In re Livent, Inc. Noteholders Securities Litigation*, 355 F. Supp. 2d 722, 729 (S.D.N.Y. 2005) ("In order to prevail on their motion, Plaintiffs must come forward with evidence demonstrating that 'there is no genuine issue as to any material fact' related to the [misstatements]."); *cf. In re Initial Public Offering Securities Litigation*, 227 F.R.D. 65, 105 (S.D.N.Y. 2004) ("[O]nce the plaintiff establishes the materiality of the omission . . .").

### A.    *Meltzer's Immateriality Arguments*

The Court will first consider Meltzer's arguments.  Meltzer moves for summary judgment and opposes the SEC's motion for summary judgment on the grounds that his misstatements and misrepresentations were immaterial as a matter of law.  To that end, he raises a number of arguments that will be addressed in turn.

### 1.    *The "Bespeaks Caution" Doctrine*

Meltzer's submissions stress above all else the fact that all of his e-mails were "replete with qualifiers and disclaimers" (quoted in full in the Background section, *supra*) clearly warning

recipients that the he was "not a registered investment advisor, broker, or dealer," and that "investment in the companies reviewed is speculative and extremely high-risk and may result in the loss of some or all of any investment."  According to Meltzer, his e-mails thus "plainly 'bespeak caution.'" because they "'virtually bristle with warnings as to the extremely speculative nature of the investment described therein.'" (Def.'s Opp'n Mem. at 12 (quoting *Haggerty vl. Comstock Gold Co.*, 765 F. Supp. 111, 115 (S.D.N.Y. 1991).)  One obvious flaw with this line of reasoning is that the relevant misstatements were in the disclaimer itself, thus rendering the cautionary language deceptive.  Furthermore, although Meltzer suggests that the disclaimers inserted in his e-mails must immunize him from the SEC's claims, the issue is not nearly so simple.

Under the "bespeaks caution" doctrine, misrepresentations or omissions in conjunction with the purchase or sale of securities are considered immaterial where contained in communications or documents including "cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable," *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) (citations omitted), and thus nonactionable.  *In re Donald J. Trump Casino Sec. Litig. — Taj Mahal Litig.*, 7 F.3d 357, 364 (3d Cir. 1993).

As the Second Circuit has noted,  "[c]autionary language in securities offerings is just about universal." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).  But "[g]eneralized disclosures of amorphous risks will not shield defendants from liability"; instead, the cautionary language must be "specific and factual" and "expressly warn of" or "directly relate to" the forward-looking statements in question.  *In re Initial Public Offering*, 358 F. Supp. 2d at 211-12 (citations omitted) (holding insufficient cautionary language in defendant's Registration

Statement, which mentioned in general fashion potential loss of advertising contracts and problems with e-mail system, but failed to note that seventy-five percent of advertising contracts were due to expire in one month, and that e-mail system had "peculiar problem" of deletion of e-mail addresses when overwhelmed with "junk mail"). It must be remembered that the "cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass in dealing with the contingent or unforeseen future." *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). Thus, the doctrine does not apply to "historical or present fact-knowledge within the grasp of the offeror." *Id.* "Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *Id.* In sum, the "bespeaks caution" doctrine does not apply "where a defendant knew that its statement was false when made." *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000).

In the present case, the statements in Meltzer's e-mails — in fact, the statements within the disclaimers themselves — clearly misrepresent present or historical facts. In particular, Meltzer's disclaimers stated that "[a]ll statements of opinions are those of Stock-Vest" (for example) — when in fact, as Meltzer now insists himself, the "statements of opinions" were entirely those of his Cohen and Weinstein. Meltzer's disclaimer also indicated that he "relies exclusively on information gathered from public filings on featured companies, as well as, in certain circumstances, interviews [with] management." This too was misleading: Meltzer may have attached or linked the press releases or public filings of the companies he discussed, but his opinions in fact exclusively relied on (and indeed were written by) Cohen and Weinstein. In

-18-

sum, Meltzer's e-mails contain statements contain more than mere forward looking projections; they contain inaccurate statements of past and current fact that are not shielded by his cautionary language. For this reason as well, the "bespeaks caution" doctrine provides no defense for Meltzer as a matter of law.

       2.       *Meltzer's Other Arguments*

In addition to the "bespeaks caution" doctrine, Meltzer makes or appears to make several other arguments against the materiality of his misstatements. First, Meltzer asserts that when considering the "total mix" of information, no reasonable investor could consider the misrepresentations material because some of the e-mails "were specifically labeled advertisements." Not only does Meltzer fail to provide any citations to support this proposition, but the case law indicates that misrepresentations contained in advertisements can be material. *Cf. Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1329-30 (11th Cir. 2002) ("As we have indicated in various prior commodities cases, the fact that the Commercial had a general risk disclosure statement does not automatically preclude liability . . . where the overall message is clearly and objectively misleading or deceptive."); *and S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 606-07, 615-16 (D.C. Cir. 2000) (holding that defendant's assistance in preparing "advertising brochure" containing false and misleading statements and mailing brochure to potential investors constituted securities fraud). Thus, the fact that some of the e-mails were labeled "ADV" does not render those misstatements immaterial as a matter of law. What's more, many of the e-mails were not labeled "ADV," and Meltzer's argument is entirely unavailing as to those misstatements.

Meltzer also argues that the disclaimers did not misstate the extent of Meltzer's involvement in the composition of the materials because "he did do a substantial amount of work." (Def.'s Opp'n Mem. at 17.) This argument stands at odds, however, with Meltzer's deposition testimony (*see, e.g.*, Meltzer Dep. at 73 (Q: "[Y]ou knew it was their opinion and not yours?" Meltzer: "Yes.")), and other arguments in his own memoranda (*see, e.g.,* Def.'s Opp'n Mem. at 15 ("[Meltzer] only played a ministerial role in connection with the newsletter."). Besides being entirely inconsistent with his own testimony, this argument also fails because it essentially an argument that the statements were in fact "true"–which they were not–rather than the issue at hand, which is whether they were material. Accordingly, the argument provides no support for Meltzer's motion for summary judgment.

In sum, as there is no merit to any of Meltzer's arguments that the misstatements were immaterial as a matter of law, the Court denies Meltzer's motion for summary judgment.

B.       *The SEC's Arguments In Favor of Materiality*

Though the Court has dispensed with Meltzer's arguments against materiality, the Court must still determine whether the misstatements were material as a matter of law, thereby entitling the SEC to summary judgment. The SEC argues that Meltzer's statements and omissions were material because, while he "knowingly misrepresented to potential investors that the newsletters he published contained his opinions , based . . . on a review of public filings," he "at no time performed any analysis or research concerning the stocks he was touting," and instead simply regurgitated the statements of the stocks' promoters, without disclosing "the actual source of the content of his touts, or the far larger financial interest they had in the companies." (SEC Summ. J. Mem. at 9-10.) Further, says the SEC, "Meltzer's spam and websites, purportedly

disseminated and operated by numerous, distinct business entities, gave potential investors the misimpression that there was more than one person recommending the purchase of the issuer's stock or who conducted research concerning the issuer's stock." (*Id.* at 10.) In sum, the SEC argues that "a reasonable investor would assume Meltzer's opinions came exclusively from public filings and management interviews," but "would certainly discount a recommendation to purchase securities if that investor knew that the promotional information was merely a reprint of information from a stock promoter whose financial interests would be served by successfully inducing others to invest." (*Id.*)

In support of its position, the SEC cites to *Hoxworth v. Blinder, Robinson, & Co.*, 903 F.2d 186 (3d Cir. 1990), and *SEC v. Gorsek*, 222 F. Supp. 2d 1099 (C.D. Ill. 2001). Both of those cases are distinguishable, however, and do not support a conclusion of materiality as a matter of law in this case.

In *Hoxworth*, the Court held that "whether or not a 'buy' recommendation (an implicitly a subsequent 'sell' recommendation) is based on the study of a research department is a material fact." *Hoxworth*, 903 F.2d at 201 (citation omitted). A securities dealer represented that its "research department" had researched the stocks that were being recommended. It failed to mention that the "research department" consisted of a single individual "who performed no independent research and who only recommended stocks underwritten by" the dealer. *Id.* at 200 n.20.

The present case poses a different scenario, however, from that in *Hoxworth*. It is undisputed that Meltzer did not do the research himself, but it remains undetermined whether the material provided to Meltzer was the product of independent research by Cohen and Weinstein.

Thus, the *Hoxworth* opinion is nondispositive because it does not answer the present question of whether misrepresenting who did the research–rather than whether any research was actually done–is a material fact.

*Gorsek* similarly provides little support for the SEC's position. In *Gorsek*, the court found that a disclaimer was materially misleading because it "did not tell the reader of the profile that [the stock research firm] stood to gain if the price of the stock went up. The disclaimer did not tell the reader of the profile that [the stock research firm] had done no independent research on the company and that all of its statements were just rehashed company material." *Gorsek*, 222 F. Supp. 2d at 1109. Again, the present case is distinct, primarily because Meltzer's disclaimer did state that Meltzer was an interested party. Furthermore, though Meltzer did no independent research on the companies he touted, it has not been established by the SEC that all of the statements made via e-mail and through the website were simply rehashed company material. Those materials may have been composed independently by Cohen and Weinstein. (*See, e.g.,* SEC Summ. J. Mem. at 6 ("Meltzer has admitted that he simply republished, almost verbatim, the recommendations and representations he received from the various *stock promoters* who paid him . . . ." (emphasis added)).) To the extent that those materials were independently composed by Cohen and Weinstein, *Gorsek* is nondispositive.

Upon perusing other relevant caselaw, the Court concludes that it is not clear whether a reasonable investor would have found the misstatements material. First, the materiality of whether the fact that Cohen and Weinstein, rather than Meltzer, composed the substantive portions of the e-mails and websites is uncertain. Though the disclaimer's indication that Meltzer (or, *e.g.*, Stock-Vest) was the entity touting the stock is undoubtedly misleading, it

remains a question of fact whether the true identity of the touter is material to the reasonable investor. To that end, there is nothing in the evidence submitted to suggest that the names "Cohen" and "Weinstein" mean anything more or less to a potential investor than the name "Meltzer" (or, *e.g.*, "Stockvest").

In addition, though it is certainly inaccurate that Meltzer (or, *e.g.*, Stock-Vest) conducted interviews with management, Cohen and Weinstein may have conducted such interviews. As such, though it is misleading that Meltzer (or, *e.g.*, Stock-Vest) conducted the interviews, it may very well be true that the actual substance of the e-mails and websites was based in part upon such interviews. If that is the case, the misstatement's materiality may dissipate.

Finally, though the disclaimer misstates the amount of compensation received by the composer, it nevertheless discloses the fact that a conflict of interest exists. Though Meltzer testified that Cohen and Weinstein received "considerably" more compensation that he had (*see* Meltzer Dep. at 32), the difference in compensation may or may not be material to a reasonable investor; it may be that simply being alerted to the fact that some significant amount was paid is significant, but that the actual amount is immaterial. Furthermore, the SEC has failed to establish the actual amount of compensation that was paid to Cohen and Weinstein.

In sum, a reasonable fact finder could conclude that the misstatements, while false and misleading, would not have altered the total mix of information available to the potential investor. Keeping in mind that courts have been "careful not to set too low a standard for materiality," *Press*, 166 F.3d at 539 (quoting *Basic*, 485 U.S. at 231), the Court denies the SEC's motion for summary judgment. This conclusion is consistent with the Second Circuit's general position that "[t]he determination of materiality is a mixed question of law and fact that generally

should be presented to a jury," *Press*, 166 F.3d at 538; *see also TSC Industries, Inc.*, 426 U.S. at 450 ("Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment.").

*CONCLUSION*

In accordance with the foregoing, the Court denies both the SEC's and Meltzer's motions for summary judgment.

**SO ORDERED.**

Dated: Central Islip, New York
July 10, 2006

_____/s/_____
Denis R. Hurley
Unites States District Judge